IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CINCINNATI INSURANCE COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12 C 9102 |
| | ) | |
| **NORTHRIDGE BUILDERS, INC.,** | ) | |
| **ANTHONY PUNTILLO, DDS** and | ) | |
| **MARY PUNTILLO**, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Cincinnati Insurance Company ("Cincinnati") sued defendants Northridge Builders, Inc. ("Northridge") and Anthony and Mary Puntillo ("the Puntillos") in Illinois state court to obtain a declaratory judgment that it had no duty to defend or indemnify Northridge in a separate Indiana state-court action (the "Indiana action") that had been brought by the Puntillos against Northridge. Defendants removed the action to this Court under 28 U.S.C. § 1441, because total diversity of citizenship exists among the parties[1] and the amount in controversy exceeds $75,000, so that the jurisdictional requirements of 28 U.S.C. § 1332 ("Section 1332") are met.

Cincinnati and defendants have now filed cross-motions for summary judgment and have completed the briefing on those motions. For the reasons set forth in this opinion, Cincinnati's motion for summary judgment is granted while defendants' motion is denied.

---

[1] Cincinnati is a citizen of Ohio under both facets of Section 1332(c)(1), while Northridge is an Illinois citizen and the Puntillos are Indiana citizens.

**Legal Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to the nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Typically one more complexity would be added where, as here, cross-motions for summary judgment are involved. That is, in most cases the same principles just mentioned would require the adoption of a dual perspective that this Court has often referred to as Janus-like: As to each motion the nonmovant's version of any disputed facts would have to be credited. But here all relevant facts are undisputed -- indeed, the parties dispute only facts that turn out to be irrelevant to determination of the issues presented by the motions (and so those facts are not recounted here).

**Factual and Procedural Background**[2]

So here are the undisputed facts. Cincinnati sells insurance in several states, Illinois included (C. St. ¶ 1). Northridge is a general contractor specializing in constructing luxury homes and has its principal place of business in Illinois (id. ¶ 3). From its inception up to and including the time relevant to this lawsuit, Northridge completed about 350 building projects in Illinois, plus 2 houses in Massachusetts and just 1 (the Puntillo residence) in Indiana -- it completed projects in no other state (id. ¶¶ 32-35). Cincinnati began insuring Northridge in 1993 and continued doing so through a series of commercial general liability ("CGL") policies ("the Policies") that covered the entire relevant period of this lawsuit (id. ¶¶ 11-20). Those Policies imposed on Cincinnati the duties to defend and indemnify Northridge should certain kinds of allegations be made (or judgments be entered) against Northridge (id. ¶¶ 21-22).

Northridge purchased the Policies from Cincinnati through an insurance agent based in Illinois, the Policies were delivered in Illinois and Northridge paid for them from an Illinois bank account (id. ¶¶ 36-52). They provided (in language that is standard fare among CGL policies in Illinois) that Cincinnati would have the duty to defend and indemnify Northridge in lawsuits seeking damages for "bodily injury" and "property damage" (id. ¶ 21). But Cincinnati's duty was subject to this important limitation (id.):

---

[2] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion identifies Cincinnati's and defendants' respective submissions as "C." and "D." followed by appropriate designations: LR 56.1 statements as "St. ¶ --," responsive statements as "Resp. St. ¶ --," and memoranda as "Mem.--" and "Resp. Mem.--." This opinion also has occasion to make several references to the Puntillos' Complaint in the Indiana action, a pleading that for brevity's sake is as simply spoken of as the "Indiana Complaint."

> b. This insurance applies to "bodily injury and "property damage" only if:
>
> > (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" . . .[3]

As for the word "occurrence," it in turn received this Policies definition (id. ¶ 23):

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Thus Cincinnati assumed the duty of defending and indemnifying when the property damage complained of in the underlying suit was caused by an accident -- but the Policies nowhere defined "accident." For that reason the word "accident" will no longer be placed in quotation marks in this opinion until the discussion turns to the Illinois caselaw that gives the word substantive content as it is defined by the Illinois courts. And now to the factual matrix into which the legal questions must be placed.

In 2006 Northridge signed a contract with the Puntillos to build them a luxury home in Chesterton, Indiana (A. Puntillo Dep. 14:5-16:12, D. St. ¶ 53). Because there was unsuitable soil on the part of the Puntillos' lot where they wanted the home built (D. St. ¶ 2), Northridge hired soils engineer Associated Engineering and Technology, Inc. and excavator Timberridge Contracting (collectively "the subcontractors") to investigate soil conditions and perform remediation work that would (they hoped) make the Puntillos' lot suitable for home construction (D. St. ¶¶ 2-3). With that work completed, Northridge finished construction of the Puntillo residence on or about March 1, 2008 (C. St. ¶ 60).

Soon after moving in the Puntillos noticed damage to their home that suggested subsidence, including an open mortar joint on a fireplace, doors that would not close properly and cracks on both interior and exterior walls (id. ¶ 65). So the Puntillos sued Northridge in an

---

[3] [Footnote by this Court] Identical limiting language was found in the Policies' separate umbrella part (id. ¶ 22).

Indiana state court in January 2012 for breach of the statutory warranties for new construction embodied in Ind. Code Ann. §§ 32-27-2-1 et seq. (D. St. ¶¶ 7-8). There they alleged that Northridge was aware of "unsuitable soil . . . beneath the footprint of the residence," that "Northridge did not take sufficient measures to remediate the unsuitable soil beneath the Residence" and that they "sustained actual damages to the Residence as the result of excessive settlement due to compression and subsidence of the remaining unsuitable soil beneath the Residence" (Indiana Complaint ¶¶ 7-9 (Dkt. 1 at 21).

On January 24, 2012 Northridge requested defense and indemnification from Cincinnati under the Policies (C. St. ¶ 74). Cincinnati denied both by a letter dated March 2, 2012 and then, as mentioned earlier, brought this lawsuit in an Illinois state court (id. ¶¶ 75-76). But the Indiana litigation continued, resulting in a jury verdict in favor of the Puntillos and against Northridge in the amount of $800,835, and judgment was entered in that amount by the Indiana Superior Court for Porter County on December 20, 2013 (D. St. ¶ 19).

On the current cross-motions Cincinnati argues that Illinois law applies to the controversy and that under Illinois law the damage to the Puntillo residence is not an accident because it was caused by the subcontractors' faulty work. For their part the defendants contend that Indiana law should apply, but they say that even if it does not the damage to the Puntillo residence was an accident because it was unintended and unforeseen. As this opinion will now make clear, Cincinnati has by far the better of the argument on both points.[4]

---

[4] Both sides have also addressed the numerous exclusions and exceptions contained in the Policies, but as Cincinnati correctly points out those exclusions and exceptions are relevant only if the damage to the Puntillos' home was accidental. Because this opinion determines that it was not -- and because the question is not really even close -- those other arguments are rendered totally hypothetical. Hence this opinion expresses no view as to them.

## Choice of Law

First comes the parties' dispute over whether Illinois or Indiana law applies. West Bend Mut. Ins. Co. v. Arbor Homes LLC, 703 F.3d 1092, 1095 (7th Cir. 2013) recently restated the well-known first step in a choice of law analysis where, as here, the parties' contract contains no choice of law provision:

> A district court sitting in diversity must apply the choice of law principles of the forum state . . . to determine which state's substantive law governs the proceeding.

And so Illinois choice-of-law principles govern this Court's analysis.

Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co., 166 Ill. 2d 520, 655 N.E.2d 842 (1995) is the leading case on the application of Illinois choice-of-law principles to insurance contracts covering subject matter in multiple states.[5] There an Illinois corporation sought defense and indemnity because of administrative proceedings instituted against that corporation by the State of Minnesota, arising from property that the corporation owned in Minnesota.

First the Lapham-Hickey court stated the governing principle in these terms (166 Ill. 2d at 526-27, 655 N.E.2d at 845) (internal quotation marks omitted):

> Absent an express choice of law, insurance policy provisions are generally governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.

Lapham-Hickey, id. then weighed those factors and determined that Illinois law applied because (1) the insured was an Illinois corporation, (2) the policy was delivered in Illinois and (3) the policy covered sites in six states, which meant in the court's view that the potential application of Minnesota law raised concerns about administrability and frustration of the parties'

---

[5] As relevant here, Northridge itself was the insured risk under the Policies, and it could claim coverage for property damage liability arising from any of its worksites (C. St. ¶ 11, 24-35).

expectations -- for it would imply that the bodies of insurance law in any of six different jurisdictions could govern the policy, depending on where a claim arose.[6]

Parallels between this case and Lapham-Hickey should be obvious: Northridge is an Illinois corporation with most of its business in Illinois, the Policies were delivered in Illinois and the Policies covered sites in three states. Precisely the same concerns that animated Lapham-Hickey point strongly (and indeed conclusively) in favor of a finding that Illinois law applies.

Defendants assert that Soc'y of Mt. Carmel v. Nat'l Ben Franklin Ins. Co. of Ill., 268 Ill. App. 3d 655, 643 N.E.2d 1280 (5th Dist. 1994) should govern instead. That case found the location of the insured risk (understood as the physical site giving rise to a claim, rather than the organization owning that site) outweighed all other factors even if that would cause the laws of several jurisdictions to apply to a single insurance policy (268 Ill. App. 3d at 665, 643 N.E.2d at 1287). But as Cincinnati correctly points out, Soc'y of Mt. Carmel was an Illinois Appellate Court opinion issued the year before the Illinois Supreme Court handed down Lapham-Hickey. And indeed in the years since Lapham-Hickey Illinois courts have given less weight to the site of the insured loss, and more weight to ensuring that a single body of law will predictably apply to any given set of insurance policies (see the thorough discussion of that shift in approach in Liberty Mut. Fire Ins. Co. v. Woodfield Mall, L.L.C., 407 Ill. App. 3d 372, 381-82, 941 N.E.2d 209, 216-18 (1st Dist. 2010)).

So there can be no doubt that Lapham-Hickey and not Soc'y of Mt. Carmel reflects the law of Illinois. And because only one consideration listed in Lapham-Hickey weighs in favor of

---

[6] Lapham-Hickey, 166 Ill. 2d at 527, 655 N.E.2d at 845 also found it probative that the policy contained two specific provisions where the location of the subject property would determine the law to be applied.

the application of Indiana law to the Policies -- that the site of the insured loss is in Indiana -- and furthermore because Lapham-Hickey (and Liberty Mut. as well) deemphasized the importance of that very consideration under facts closely analogous to those presented here, the law of Illinois unquestionably governs the interpretation of the Policies.

## **Whether the Subsidence Damage was an "Occurrence"**

That brings this opinion to the meaning of the Policies. And as Liberty Mut., 407 Ill. App. 3d at 385, 941 N.E.2d at 220 teaches in that respect:

> When construing an insurance contract, an Illinois court will give the parties' words their plain, ordinary, and generally accepted meaning.

As to the duty to defend in particular, Lyerla v. AMCO Ins. Co., 536 F.3d 684, 688 (7th Cir. 2008) (internal citations and quotation marks omitted, emphasis in original) usefully summed up a number of Illinois Supreme Court cases:

> In order to determine whether an insurer has a duty to defend its insured, we must compare the allegations in the underlying complaint to the language of the insurance policy. If the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent. An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.

And it logically follows that if there is no duty to defend, a fortiori there is no duty to indemnify (Crum & Forster Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384, 398, 620 N.E.2d 1073, 1081 (1993)).

Because CGL policies are widespread and use common terminology, Illinois has special interpretive rules governing the meaning of "occurrence" and "accident" in those policies. Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n, 764 F.3d 726, 731-32 (7th Cir.

2014) recently restated those rules at some length, and that restatement is so directly applicable to the present case that it is worth quoting in its entirety:

> By their terms, the policies apply to "property damage" only if such damage is caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[7] While the policies do not define the term "accident," in interpreting insurance policies, "Illinois courts have defined 'accident' as an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." Westfield Nat'l Ins. Co. v. Cont'l Cmty. Bank & Trust Co., 346 Ill.App.3d 113, 281 Ill.Dec. 636, 804 N.E.2d 601, 605 (2003) (citation omitted). Moreover, "[t]he natural and ordinary consequences of an act do not constitute an accident." Id. Applying this principle in the context of development and building construction, several Illinois cases have held that "damages that are the natural and ordinary consequences of faulty workmanship do not constitute an 'occurrence' or 'accident.'" Stoneridge Dev. Co. v. Essex Ins. Co., 382 Ill.App.3d 731, 321 Ill.Dec. 114, 888 N.E.2d 633, 652 (2008) (collecting cases). To hold otherwise and "[f]ind[ ] coverage for the cost of replacing or repairing defective work," Stoneridge reasoned, "would transform the policy into something akin to a performance bond." Id., 321 Ill.Dec. 114, 888 N.E.2d at 653 (quoting Travelers Ins. Co. v. Eljer Mfg., Inc., 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481, 503 (2001) (internal quotation marks and citations omitted)). Another reason to disfavor such an interpretation is that "insurance proceeds could be used for damages from defective workmanship," or "a contractor could be initially paid by the customer for its work and then by the insurance company to repair or replace the work." Lagestee–Mulder, Inc. v. Consol. Ins. Co., 682 F.3d 1054, 1057 (7th Cir.2012) (quoting CMK Dev. Corp. v. W. Bend Mut. Ins. Co., 395 Ill.App.3d 830, 335 Ill.Dec. 91, 917 N.E.2d 1155, 1168 (2009)) (internal quotation marks omitted). In order to avoid such undesirable outcomes, Illinois courts require that for an incident to constitute an "occurrence" or "accident" in the building construction context, "there must be damage to something other than the structure, *i.e.*, the building, in order for coverage to exist." Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co., 358 Ill.App.3d 34, 294 Ill.Dec. 478, 831 N.E.2d 1, 16 (2005) (citations omitted). "[T]he natural and ordinary consequences of defective workmanship ... d[o] not constitute an 'occurrence.'" Id.

In that strikingly pertinent summary of the law, only one component relevant here was missing: Damage resulting from defective work performed by subcontractors is also not an "accident" and thus not an "occurrence" within the meaning of a general contractor's CGL policy (see the

---

[7] [Footnote by this Court] That of course is the precise definition of "occurrence" used by the Policies (C. St. ¶ 23).

thoroughgoing discussion of that precise point in Stoneridge, 382 Ill. App. 3d at 755-57, 888 N.E.2d at 656-57).

It is thus exceedingly plain -- perhaps "painfully obvious" is more like it -- that Cincinnati had no duty to defend Northridge in the Indiana action. "Northridge did not take sufficient measures to remediate the unsuitable soil" is the central allegation (along with the subsidence damage itself) in the Indiana Complaint ¶ 8 (Dkt. 1 at 21). And in their Response to Cincinnati's statement of facts, defendants admit that "the damage to the Puntillo home was caused by the acts or omissions of an architect and a soils engineer" (D. Resp. St. ¶ 77). Both parties have thus agreed -- both now and at the time the Indiana action was instituted -- that the subsidence damage was the ordinary and natural consequence of the subcontractors' defective workmanship. Hence the Indiana Complaint raised no possibility that Northridge could be found liable for an "occurrence" within the meaning of the Policies, and Cincinnati had no duty to defend.

Despite the clarity and inexorable force of the law on that score, defendants advance two reasons in an attempt to characterize the subcontractors' defective work and the consequent subsidence as having been an "occurrence" within the meaning of Illinois law: (1) that the Indiana action involved a legal theory premised on Northridge's breach of a statutory warranty and "without regard to fault or breach of contract" (D. Mem. 1) and (2) that Northridge did not actually intend to damage the Puntillos' house or actually foresee that its subcontractors' shoddy work would damage their house. Neither of those arguments moves the ball forward at all.

As to the first point, the theory of liability in an underlying action is entirely irrelevant to the determination whether certain acts constitute an "occurrence." Several reasons support that proposition.

First of all, standard CGL policies (including the Policies here) define "occurrence" in terms of real-world facts, not legal theories. "Occurrence" is defined primarily as "an accident" (C. St. ¶ 23), and as has just been made clear Illinois law defines "accident" without regard to any particular legal theory (whether negligence or breach of contract or warranty) -- something that makes good sense, given that an insurer's duty to defend necessarily arises <u>before</u> the merit of particular theories of liability is known. Furthermore, as recounted in <u>Nautilus</u>, it would conflict with the public policy of Illinois as announced in <u>Travelers Ins. v. Eljer Mfg.</u>, 197 Ill.2d at 313-14, 757 N.E.2d at 503 to allow contractors to recover under generic CGL policies for <u>any</u> defective work they do, without regard to what exact legal theory an injured homeowner asserts. And perhaps most fundamentally, <u>Stoneridge</u> -- the Illinois case most directly on point here and the case most damaging to defendants' arguments -- also involved a claim against a builder for breach of an implied warranty that could be disclaimed under certain circumstances by contract (888 N.E. 2d at 647-48, 382 Ill. App. 3d at 746-47), which is of course closely analogous to the statute at issue in the Indiana action (see Ind. Code Ann. § 32-27-2-8 and 32-27-2-9). So even defendants' purported distinction between theories of liability based on negligence or contract and those based on warranties implied by the law is actually no distinction at all.

As for defendants' second asserted reason to view the subsidence as an "occurrence" -- the notion that Northridge did not actually intend or foresee the damage to the Puntillo residence -- it clearly carries no weight under Illinois law. As <u>Stoneridge</u>, 382 Ill. App. 3d at 751, 888 N.E. 2d at 652 (internal citations and quotation marks omitted) stated unequivocally:

> Thus, we believe that, even if the person performing the act did not intend or expect the result, if the result is the rational and probable consequence of the act or, stated differently, the natural and ordinary consequence of the act, it is not an "accident."

Defendants cannot (and do not) disagree with the causal reality that the subsidence damage to the Puntillos' home was the "natural and ordinary consequence" of the subcontractors' defective soil remediation. Under Stoneridge (and a string of earlier cases, see Viking, 358 Ill. App. 3d at 46-54, 831 N.E. 2d at 8-16) that means the damage was no "accident" and hence was not an "occurrence."[8]

There really can be no doubt that the subcontractors' defective work, which both parties agree caused the subsidence at issue, was not an "occurrence" within the meaning of the CGL as interpreted according to well-established Illinois precedent. And because the Policies undisputedly cover only damage resulting from an "occurrence," it is equally free from doubt that Cincinnati had no obligation to defend and hence has no obligation to indemnify Northridge.[9] It is entitled to a judgment as a matter of law.

## Conclusion

As stated earlier, there is no genuine issue of material fact in dispute in this action, so that a judgment may be entered as a matter of law. For the reasons stated in this opinion, the motion for summary judgment filed by Cincinnati Insurance Company ("Cincinnati") (Dkt. No. 69) is granted and the cross-motion for summary judgment filed jointly by Northridge Builders, Inc. ("Northridge") and Anthony and Mary Puntillo ("the Puntillos") (Dkt. No. 77) is denied.

---

[8] It is true that a single case -- Country Mut. Ins. Co. v. Carr, 372 Ill. App. 3d 335, 343, 867 N.E.2d 1157, 1163 (4th Dist. 2007) -- has gone the other way, but Stoneridge "roundly criticized" that decision, as Nautilus specifically noted (764 F.3d at 732 n.1), in the course of its thorough analysis.

[9] Careful readers will have noted that the just-cited portion of Viking (358 Ill. App. 3d at 46-54, 831 N.E. 2d at 8-16) provides a separate and independent reason to grant summary judgment to Cincinnati: Under Illinois rules for construing CGL policies, "property damage" does not include damage to the defectively-built structure itself. But the Puntillos alleged only damage to their own residence (Indiana Complaint ¶ 9 (Dkt. 1 at 21)). Because they thereby did not allege "property damage" within the meaning of the Policies (see C. St. ¶¶ 21-22), Cincinnati had no duty to defend for that reason as well.

Accordingly a final judgment is ordered to be entered in favor of Cincinnati and against Northridge and the Puntillos declaring (1) that Cincinnati had no duty to defend Northridge in the action brought against it in Indiana by the Puntillos and (2) that Cincinnati had and has no duty to indemnify Northridge for the judgment entered against it in that Indiana action.

_____
Milton I. Shadur
Senior United States District Judge

Date: September 30, 2015